# Bombaugh *versus* Miller.

1. The entry upon a lane by defendant whose title was acquired under a deed calling for boundaries that embraced said lane, and his holding the same continuously for twenty-one years, will not bar the right of way of plaintiff whose right to the free and unmolested use of said lane was granted by deed, unless there has been an absolute denial of his right by defendant, with an occupation inconsistent with its use by plaintiff.

2. To prove the abandonment of a servitude created by deed something more must be done than to show that it was rarely exercised by the grantee, and where the plaintiff had not the exclusive but the concurrent use of a lane, and his reserved right was spread upon the record and appeared in defendant's chain of title and the latter had other notice thereof, it was error to instruct the jury that plaintiff was obliged to continuously use the grant to avoid a presumption of its abandonment.

May 27th 1876.    Before AGNEW, C. J., SHARSWOOD, MERCUR, GORDON, PAXSON and WOODWARD, JJ.    WILLIAMS, J., absent.

Error to the Court of Common Pleas of *Dauphin county*: No. 108, of May Term 1876.

This was an action of trespass on the case, brought by Aaron Bombaugh against J. Peter Miller for obstructing a way of which the plaintiff alleged he had the use.

[Bombaugh *v.* Miller.]

The facts are briefly these :—

On the 14th of October 1790, Adam Eckert conveyed to Conrad Bombaugh, his heirs and assigns, a five-acre out-lot, bounded by Eckert's lane on the south and the road now the Millerstown turnpike on the west, being No. 1 in a plan of lots laid out by said Eckert in Paxton township (now in the city of Harrisburg).

The deed, in the description of which reference was made to a twenty-feet alley, contained the further grant " of the free, open and unmolested use of the twenty-feet alley aforesaid and extendeth the same by these presents through his, the said Adam Eckert's, other land not laid out as aforesaid down to the low-water mark of the said river (Susquehanna)."

The title to a portion of this five-acre lot is in the plaintiff.

Adam Eckert, on the 28th of April 1791, also conveyed to Stacey Potts three acres of land in the aforesaid Paxton township, " beginning at line of lands of William Maclay, thence by the west side of the Millerstown turnpike northwest 66 perches to Henry Fulton's road and extending back to the Susquehanna river."

" Also one other small piece or strip of land along the lane or road which runs from the river towards Paxton creek between said road or lane and the out-lots, being twelve feet in width on the east side of the river road, between lands of William Maclay and said lane, and runs along the side of the lane, N. 62½ E., to a post on the creek."

On the 14th of May 1811, Potts conveyed to Jacob Reimer a quarter of an acre of this three-acre lot, beginning at the line of the lands of William Maclay, thence by the Millerstown turnpike one hundred and five feet to a post at lot of Peter Laborde ; thence. at right angle to the Susquehanna river ; thence down the river one hundred and five feet to land of William Maclay and along the same to place of beginning.

This quarter of an acre by various mesne conveyances became vested in 1843 in George Hammond, who in the place of an old log house thereon built a brick tavern, and from him by another series of conveyances it became in 1873 the property of J. Peter Miller, the defendant in this suit, who converted the tavern into a residence and enclosed his land with a fence. The building of this fence is the cause of this action, the plaintiff contending that it obstructed his way to the river, the right to which was given to him by the grant in the deed of Adam Eckert to Conrad Bombaugh, which extended the lane down to the low-water mark of the river and of which the defendant had notice in the Potts deed in the line of his title.

There was evidence that there was a lane east of the turnpike (now Herr street), that the plaintiff's family had watered their cattle at various times by driving them down to the river, but not for some years past ; that there were no fences south of the tavern, but it was all open along the river ; that the way down was steep and

washed. Evidence was also given of the location of the Maclay line and of the distance from this line of the tavern which Hammond built and of a porch which extended several feet therefrom. Plaintiff also testified that he had given permission to Hammond to have the porch so long as he, plaintiff, had room to go to the river.

There was evidence also that when defendant purchased the land and measured it, he knew there were several feet more ground than those from whom he bought claimed, and he said he would take it up and pay taxes on it.

Defendant contended that the location of the lane on the east side of the turnpike was not definitely shown by plaintiff, and that the conveyance in the Potts deed of the twelve-feet-wide slip, extending from the turnpike to Paxton creek, and lying between the Maclay line and the lane, showed that the south side of the lane was at least twelve feet north of the Maclay line; and if this was so, it must have been wholly obstructed on the west side of the turnpike by buildings erected there forty years ago. He further contended that, in any event, the south side of the lane must have been as far north as the Maclay line, and that Mr. Hammond in 1843 erected a tavern and attached a porch thereto, which occupied the space above the Maclay line for over twenty feet, and that if the lane, therefore, was where plaintiff claimed, then defendant and those from whom he claimed had obstructed and had possession of said lane for the last thirty years, and plaintiff had lost his right of way by lapse of time.

The plaintiff submitted a number of points, among which were the following, with the answers of the court appended:—

5. The defendant and those under whom he claims could acquire by the Statute of Limitations only so much of said way as he or they had in actual, exclusive, continuous, uninterrupted and hostile possession for twenty years before suit brought.

Answer: "If defendant and those under whom he claims entered under the deed of April 28th 1791, and resided on it ever since, claiming the exclusive adverse possession of the whole, and the plaintiff never took possession or interrupted them, the Statute of Limitations would give defendant a good title. But did he and they claim to the Maclay line?"

8. If the Statute of Limitations gives title to defendant to any portion of the way, he is by law restrained to such portion thereof as those under whom he claims and himself held by continuous, uninterrupted and hostile possession for twenty-one years before suit brought.

Answer: "The law would be so, unless the defendant and those under whom he claims entered under a deed calling for boundaries embracing the contemplated alley or right of way, and held the same continuously for twenty-one years and upwards."

9. A building or other obstruction placed for twenty-one years

in a way, gives title only to so much of such way as is covered by such building or obstruction, and gives no title to the rest.

Answer: " Such would be the law, unless the deed under which he entered called for more extended boundaries than the house, and the use of the road was long abandoned or disused."

10. Using the way in common with the plaintiff will not give title to the way or a right to close it.

Answer: " This is so if there are any facts to support it."

The court (Pearson, P. J.) charged the jury :—

" What is there to destroy this right of way ? It commenced in 1790. The mere failure to exercise the right of way does not destroy the right. Unless something is done to obstruct my right and show I am not to go there my right is not destroyed ; I am not bound to vindicate that right by law until it is interrupted.

" The present plaintiff was sole heir to this property. There is no doubt of the right of the plaintiff so far as regards the case thus far, nor is there any doubt that there was an open lane east, about twenty feet wide. At one time there was no fence on one side, but the right continued there in all persons who bought out-lots. The dispute arises after you cross the turnpike, and go down towards the river. From that down toward the river there was no fence on either side. Maclay's land lay on one side of this lane, and Eckert's on the other, and it was sold from time to time, with the line of Maclay as a boundary. So it came on down, but called for one hundred and five feet in width, to the Maclay line. The land was sold in 1791, and it clearly embraces all the land between the great road and the river, and it calls for the Maclay line. [If a person had taken possession under that deed of the whole three acres and some perches, and had held it for more than twenty-one years, they would have a good title against Mr. Bombaugh, notwithstanding his was the oldest deed, because he did not take possession. He was only using it, perhaps, once a year for twenty years. Constant, uninterrupted possession would give a better title. It is not necessary to put a house all over the ground or fence it in. He holds it by the deed, unless adverse possession is taken by the interfering claim.]

" [All these deeds start at the Maclay line as the boundary, and run out one hundred and five feet. If that left any vacant space, it would be at the upper end.]

" Hammond commenced to use the new house as a tavern in 1844, and from that until 1873 is a period of twenty-nine years. The suit was brought in 1873, so that this brick house stood there for a period that gives title by the Statute of Limitations. What land was claimed by virtue of that possession ? [Did he claim to the Maclay line ? If when he entered into possession of that house, he claimed to the Maclay line, and the other party did not take possession, but only drove cattle along now and then upon the open common, it would not be a bar to the Statute of Limitations.]

[Bombaugh *v.* Miller.]

" The plaintiff pastured his horses and cattle in there a few years ago ; he thinks they were taken to the river there, but he did not do it himself.　There is no proof of cows being driven down there for a good many years back, [and driving cows along once in a while would not interrupt the person claiming to own.]　It would not be that kind of interruption that would prevent the Statute of Limitations from running.

" [If he continued there by his deed calling for the Maclay line as a boundary, the casual driving of cattle there just as other people's cattle went along would not prevent the Statute of Limitations from running.]

" There is no doubt at all but Mr. Bombaugh had a good title to this property at one time, and that he would have kept that title good down to the river, but the question is whether he has not lost it by lapse of time and by allowing other persons to go there and live there.

" By the draft of Mr. Cowden the Maclay line ran within six feet of the house itself, and the porch stood out six feet.　[It is said that there can be no claim on account of that porch, for Mr. Bombaugh said in his evidence that he said to Mr. Hammond, ' you may keep it until I want to use the ground,' but that does not show that Hammond used it upon that authority ; it is a declaration of Mr. Bombaugh to him.　If it had been a declaration on the part of Hammond ' I agree to give up this porch and take it away whenever you come here and claim it or want it,' then it would show that Hammond was claiming to put it there under Bombaugh, but Bombaugh's declarations do not show that he should keep it there as long as he pleased ; I do not think there is anything in that ; the porch would hold the possession as well as the house.]　Is it true then that the Maclay line ran along the porch?　If so there is no way between that porch and the Maclay line ; nothing that cattle could go along upon, for according to his evidence it touched the porch at the lower end, as the house did not stand square.

" [You will have to determine as to whether those persons who lived there and claimed the property held adverse to all the world, whether they held it as their own.　In other words, whether this right to drive cattle or ride horses down to the river was exercised by Mr. Bombaugh in common with everybody else in the town, or whether it was some exclusive right on his part made known to those persons.　A man may claim his right of way by giving notice by saying when using such way, ' I give you notice that I claim this as my right of way,' and that would probably interrupt it for one year, but it must be a continual claim to make it good for anything.]"

The verdict was for the defendant and judgment was entered thereon.

Plaintiff took this writ of error and the errors assigned were the

[Bombaugh *v.* Miller.]

answers of the court to plaintiff's points, and the parts of the charge in brackets.

*Levi B. Alricks* and *Hamilton Alricks*, for plaintiff in error.— No default was shown in plaintiff, and time does not begin to run against a privilege reserved in a deed until some default, negligence or acquiescence is shown or may be presumed in the party in whose favor such reservation is made : Butz *v.* Ihrie, 1 Rawle 218. When a right or privilege has been acquired by grant it will not be lost by non-user in analogy to the Statute of Limitations, unless there was a denial of the title or other act on the adverse part to quicken the owner in the assertion of his right: Nitzell *v.* Paschall, 3 Rawle 82 ; Lacy *v.* Arnett, 9 Casey 169 ; Hoffman *v.* Bell, 11 P. F. Smith 444 ; Erb *v.* Brown, 19 Id. 218 ; Lindsey *v.* Lindeman, Id. 100.; Curtis *v.* Keesler, 14 Barb. 511 ; Smiles *v.* Hastings, 24 Id. 44.

*J. W. Simonton*, for defendant in error.—The whole case turned on the question, conceding that plaintiff once had a right over the *locus in quo*, whether it had been so long obstructed by the house and porch built by Hammond that he had lost it, and this was fairly left to the jury and decided against him.

Mr. Justice MERCUR delivered the opinion of the court, October 9th 1876.

All the assignments of error, except the second, relate to the kind of possession necessary to bar a right of way granted by deed. Both parties claim under title derived from Adam Eckert. The plaintiff under deed executed and recorded in October 1790. Eckert thereby sold and conveyed to Conrad Bombaugh, his heirs and assigns, a certain five-acre out-lot, known as lot No. 1 in a plan of lots laid out by Eckert, bounded by Eckert's lane on the south. The deed further declared, "and the said Adam Eckert doth hereby further grant and confirm to the said Conrad Bombaugh, his heirs and assigns, the free, open, and unmolested use of the twenty-feet alley aforesaid, and extendeth the same by these presents, through his, the said Adam's, other land, not laid out as aforesaid, down to the low-water mark of the said Susquehanna." The title to the lot, and the use of the alley, became vested in the plaintiff.

The defendant acquired title to the land, covered by the alley, under deed executed by Eckert to Stacy Potts, in April 1791, conveying three acres, "also one other small piece or strip of land along the lane or road which runs from the river towards Paxton creek, between said road or lane and the out-lots * * * between lands of William Maclay and said lane and runs along the side of the lane," &c. Thus the use of the lane was expressly conveyed by

deed to the plaintiff's grantor, and the continuance of the lane was distinctly recognised in the subsequent deed to Potts, from whom the defendant derived title. The testimony shows the subsequent continuance of the lane and the use thereof for many years. The precise extent and duration of that use are not very distinctly proved. Between the turnpike and the river, there was no fence on either side, but the ground was open and used by the plaintiffs as a way of access to the river.

The plaintiff's privilege being thus reserved by deed, time did not run against it until some default, negligence or acquiescence is shown, or may be fairly presumed in him: Butz v. Ihrie, 1 Rawle 218. In that case it was held that the mere non-user for thirty-two years of a privilege reserved by deed to swell water on the land of the grantee, did not bar or forfeit the privilege reserved. So in Nitzell v. Paschall, 3 Rawle 82, it was held that a privilege devised to swell the water back on other lands of the devisor, might be resumed, although the use had been abandoned for at least thirty-eight years. There is no prescription or presumption from mere non-user of a servitude : Linderman et al. v. Lindsey, 19 P. F. Smith 93. It cannot be extinguished by disuse or lost by non-user : Curtis v. Keesler, 14 Barb. 511 ; Smiles v. Hastings, 24 Id. 44 ; Erb v. Brown, 19 P. F. Smith 216. It is true in Nitzell v. Paschall, supra, Mr. Chief Justice GIBSON says : " I think there cannot be a doubt but that lapse of time may be so great as to afford a natural presumption" of the loss of a license granted by deed. He also says when acquired by adverse possession for twenty years, it may, he should suppose, be lost by non-user for the same period. But " where it has been acquired by grant," he proceeds to say, " it will not be lost by non-user, in analogy to the Statute of Limitations, unless there were a denial of the title or other act on the adverse party to quicken the owner in the assertion of his right." This latter view of the law is affirmed in Erb v. Brown, supra. So in Linderman v. Lindsey, supra, it was held that nothing less than an absolute denial of the right followed by an enjoyment inconsistent with its existence for twenty-one years, can amount to an extinguishment.

Turning to the evidence in the case before us, we see that no exclusive right of way in the lane was granted to Bombaugh. So long as his free and unmolested use of it was not interfered with, the grantor and all others might use it without any denial of the plaintiff's right. Whether the plaintiff used it in each year or after an interval of several years, his right continued unless it was denied and followed by an enjoyment inconsistent therewith. Nor would the mere fact that the defendant, and those whose title he had acquired, claimed the right of soil in the land covered by the lane, extinguish the plaintiff's right of way. Such a claim was not inconsistent with the plaintiff's easement or servitude, unless it was

1 NORRIS—14

[Bombaugh *v.* Miller.]

followed by an adverse possession excluding the plaintiff therefrom. In so far as the house had been constructed and maintained, against the plaintiff's consent, in the lane, it was a denial of his right, and he may have lost his privilege, by lapse of time, over the ground covered thereby. There is some evidence that the brick house extends further into the lane than the old log house did. This will be a question for the jury to determine. So in regard to what one witness calls the "rough porch" at the Hammond house. The plaintiff testified, "I gave permission to use it so long as I had room to go to the river." The learned judge charged, although this permission was given to Hammond, yet it did not show the latter used it on that authority. The fact should have been submitted to the jury to find whether the porch was erected or maintained by permission of the plaintiff. If so, it cannot be said his exclusion from the ground covered thereby was in denial of his right; but it was a recognition and affirmance thereof. It was in no sense adverse.

As to the part of the lane not obstructed by house or porch, the nature of the acts done on the part of the defendant gives character to his adverse possession : Lodge *v.* Patterson, 3 Watts 77 ; Dikeman *v.* Parrish, 6 Barr 211. Therefore an entry by the defendant, or by one whose title he acquired, under a deed calling for boundaries that would embrace the lane or alley, and holding the same continuously for twenty-one years, would not of itself bar the plaintiff's right of way. There must have been superadded an absolute denial of his right united with an occupation inconsistent with its exercise.

When one seeks to prove the abandonment of a servitude created by deed, he must do more than show it to have been rarely exercised by the grantee. In this case the plaintiff had no exclusive use of the alley. It was concurrent only. He therefore had no right to take such a possession as would have excluded any one who did not interfere with his free, open and unmolested use thereof. His reserved right to such use was spread on the record. The existence of the lane was in the defendant's chain of title. The latter therefore had constructive notice of plaintiff's claim. But the testimony of Jacob S. Schlayer goes further. He testifies that when the defendant was about buying the land, he assisted him in its measurement. That he "argued the lane did not belong to the house." That the defendant answered substantially, it did not belong to the people of whom he had bought; but he would take it up and pay taxes on it.

We think, therefore, the learned judge erred in the view he expressed, both in regard to the extent the plaintiff was obliged to use the grant to avoid a presumption of its abandonment, and also as to the effect of the defendant's claiming the ground covered by his deed, and the assignments are substantially sustained.

[Bombaugh v. Miller.]

The portion of the charge covered by the second assignment is not important and we do not see that the plaintiff was prejudiced thereby.

Judgment reversed and a *venire facias de novo* awarded.