## Commonwealth ex rel. Attorney General, Appellant, *v.* Bala & Bryn Mawr Turnpike Co.

[Marked to be reported.]

*Quo warranto—Laches by commonwealth—Turnpike companies.*

Laches may be imputed to the commonwealth as well as to an individual.

Where an amendment of the charter of a turnpike company is made by the court of common pleas, and, under the decree which is unappealed from, the company, in entire good faith and without any warning or objection on the part of the commonwealth, expends a large amount of money in extending its road under the amended charter, a court of equity will refuse its aid to the commonwealth after the expiration of five years, leaving it to its remedy at law.

*Remedy at law and in equity.*

The remedy at law is not one which could accomplish the same results as a mandatory injunction, such as a writ of quo warranto or an indictment for maintaining a nuisance. It means merely an action at law to recover damages for any injury sustained.

*Amendments of charters of turnpike companies—Act, June 4, 1879.*

Not decided whether under the act of June 4, 1879, the court of common pleas may authorize amendments to charters of turnpike companies so as to extend their routes.

Argued Jan. 31, 1893. Appeal, No. 114, Jan. T., 1893, by plaintiff, from judgment of C. P. Montgomery Co., June T., 1892, No. 126, for defendant on quo warranto. Before PAXSON, C. J., GREEN, WILLIAMS, MITCHELL and DEAN, JJ.

Quo warranto against corporation.

The facts appear by the following opinion of the court below, by WEAND, J.:

"This is a proceeding to determine the right of the defendant corporation to occupy certain public roads in Montgomery

county, and comes before us on petition and answer and argument thereon, it being agreed that the case should be treated as if the commonwealth had demurred to the answer. The facts which raise the issue are as follows: The Blockley & Merion Turnpike & Plank Road Co. was duly incorporated by an act of assembly approved April 5, 1853, P. L. 291, ' to construct a stone road commencing at or near the three mile stone on the Lancaster turnpike in the county of Philadelphia, and terminating at or between the junction of Whiteman's lane in the old Lancaster road with the said turnpike in the county of Montgomery, by such route as they (the managers) shall consider best and most practicable, and shall have power to lay the track of the same on the bed of the old Lancaster road, or any other roads, or on the ground contiguous to said roads as the managers may deem most expedient,' etc. Said turnpike was constructed and toll-gates erected. On Dec. 19, 1887, the court of common pleas of Montgomery county, upon petition presented for that purpose, amended said charter by, first, extending its route westward from Wister's corner (Whiteman's lane) to Haverford station, a distance of about one mile, in Montgomery county, on the old Lancaster road, now Montgomery avenue; second, by making a branch route in Montgomery county, from a point in the present route of the turnpike of the company at Merionville, extending thence along the line of Montgomery avenue and Conshohocken state road, or by such other route, in whole or in part, as may be determined by the board of directors of the company, to a point in the City Line road, near Bala station, a distance of about one mile. In pursuance of said authority, the company turnpiked said portions of said Montgomery avenue and of said Conshohocken state road, and erected toll-gates thereon, thus making it a constituent and continuous part of their road as originally defined by their charter. In doing so the company expended large sums of money without objection from any one until Dec. 7, 1889, when the petition of certain citizens was presented to this court, praying that the amendment thus granted might be annulled and revoked. This the court declined to do, and, upon appeal, the Supreme Court sustained our decision (see decision of Blockley Turnpike Co., Wilson's Ap., 140 Pa. 177), upon the ground that the appeal had not

been taken in time. In their decision the court said: 'The power to amend charters of such companies is conferred by the act of June 4, 1879, when the court of common pleas shall be of the opinion that said alterations are lawful and beneficial. It thus appears that the court below had jurisdiction.' The present defendants succeeded to the rights of Blockley & Merion Co., and have been duly incorporated by letters patent dated Dec. 15, 1890.

"In the present proceeding it is alleged that 'the occupation by said turnpike company of said portions of Montgomery avenue and said Conshohocken state road, and its exaction of tolls for the use of the same, are without warrant of law,' because the court of common pleas of Montgomery county had no jurisdiction or authority to grant to said turnpike company a right to occupy said highways or to exact tolls for the use of the same. The same reasons were assigned in the former proceeding. At the time the amendment was allowed we were satisfied of the regularity of the proceedings, and must decline to reconsider that matter; and the only question now before us is one of jurisdiction, and this resolves itself into two propositions:

"1. Was the act of 1879 repealed by the act of June 13, 1883, P. L. 122, § 1?

"2. If not, did the power of amendment conferred by the act of 1879 give the courts the right to amend charters of turnpike companies so as to extend their route beyond the original termini, and to take possession of free public roads for that purpose?

"By reference to the paper books before the Supreme Court in Wilson's Ap., supra, we find that the first proposition was distinctly made before the court, and we might therefore rely upon the opinion of the court that the power to amend still rested in the court, and that we had jurisdiction.

"By referring to the act of 1883, it will appear that it does not in terms apply to this corporation, because it was not incorporated under the act of 1874, to which the act of 1883 was a supplement, nor has it accepted the provisions of said act of 1874 and its supplements, in which cases only does the act of 1883 apply. There is no repealing clause in the act of 1883, and, as it specifies distinctly the class of corporations to which

it applies, we cannot hold that it repeals the act of 1879 by implication.

"This brings us to the remaining and most important question as to our power to extend the limits of the original charter, and to authorize the occupation of public roads. Prior to the adoption of the constitution of 1874 the power to incorporate turnpike companies rested with the legislature, and there was then no authority to amend in the courts or by the executive, but only by act of assembly. The new constitution deprived the legislature of the power 'to pass any local or special law creating corporations, or amending, renewing or extending the charters thereof.' In consequence of this provision the corporation act of 1874 was passed, but it nowhere provides for amendments to charters of those of the second class, and corporations for profit embraced within that class, whether incorporated by act of assembly or by the governor under the act of 1874, were, therefore, without the benefit of any general law conferring this power. By the act of June 4, 1879, P. L. 91, the courts of common pleas were authorized to amend charters of such turnpike companies as should be desirous of improving, amending or altering the articles and conditions of the instrument upon which said corporations are formed and established. Notice is to be given that an application has been made for such alteration, amendment or improvement of the charter of said corporation. After said amendments were made they are to be deemed and taken to be a part of the instrument upon which said incorporation was formed and established, to all intents and purposes as if the same had been made part thereof. It is argued that the amendments contemplated by this act are only those which relate to the rules and regulations governing the company, and are not to be extended to the power to change the limits. If we deny the power of the court to enlarge the territory of a turnpike company incorporated by special acts of assembly, they will be powerless to extend their limits except by the formation of a new company under the act of 1874, and they would thus have a dual existence, the parts being governed by different laws. The legislature never intended such a condition of affairs. There was a time, if not now, when turnpike companies were considered of great public benefit, as stated by PAXSON, C. J., in his dissenting opinion in Groff's

Ap., 144 Pa. 150, and it is unreasonable to suppose that the legislature never intended or contemplated an extension to their limits. It cannot be denied that this could have been done by an act of assembly prior to 1874, and when this power was taken away from the legislature by the constitution, it remained with them to accomplish the same purpose by general laws, and they had the undoubted right to transfer their powers to the courts, and we think the act of 1879 expressly confers this right. It is the charter which is to be amended; in other words, the grant as a whole, and not some certain articles or parts thereof. The title of the act is 'to enlarge the jurisdiction of the court to amend the charters of turnpike companies,' and the act requires notice to be given 'that the charter has been asked to be amended, altered or improved,' and whichever term is used can be clearly construed to cover a change or alteration of the route or distance of the road, and in the application for amendment in this case this was expressly stated to be the desire of the company, and the roads were named which it was proposed to occupy. There is no taking of property for public use. By the original act of incorporation the managers were expressly authorized to occupy any road which they might deem expedient, and if they had then occupied the roads in question, if within the limits of their charter, the case would clearly not have been covered by Groff's Ap., 128 Pa. 621, both because there was an express grant, and because the franchise of another corporation was not invaded. In the amendment allowed, the roads to be occupied were designated and defined, and we cannot see how the case just cited can in any way apply."

" In our view of the law it is not necessary to consider the question whether the laches of the commonwealth is an estoppel. Certainly those living in the neighborhood who saw the company spending many thousand dollars on this work, and who remained silent until they had secured good roads, ought not now to be heard in this proceeding after having had their chance in court. But we must treat the case as a commonwealth proceeding, and, having considered it as a legal question involving a construction of the act of 1879, and of the jurisdiction of the court, we are of the opinion that the relator has no right to the judgment asked for.

" And now, to wit, Oct. 3, 1892, judgment is entered for de-
fendants, with costs of suit."

*Errors assigned* were, action of court (1) in not ousting ap-
pellee from occupation of highways, which are the subject of
said amendments to the charter; (2) in not declaring the right
and franchise of exacting toll for the use of said highways in-
valid; (3) in not declaring appellee in unlawful possession of
any highway not within the limits of the original charter,
(4) in not declaring that it had no jurisdiction or authority to
grant appellee a right to occupy said highways; (5) in not
declaring amendment to charter invalid; (6) in not entering
judgment for commonwealth; (7) in entering judgment for
the defendants with costs.

*John G. Johnson, W. U. Hensel,* attorney general, with him,
for appellants.—Laches cannot be claimed against the common-
wealth. If the appellee has illegally appropriated its highway
for its purposes, she has a right to oust it from such occupancy.
Whilst it may not be open to appellant to raise any question
of irregularity in the proceedings of the court below, it is cer-
tainly open to it to object to an appropriation of its highways,
under an order of court, if there was no jurisdiction in such
court to make such appropriation. In point of fact there were
no laches.

There was no jurisdiction in the court to authorize appellee
to construct a branch, or to extend its turnpike beyond the
points originally limited by the charter. Appellee had such
power to appropriate public highways: Groff's Ap., 128 Pa.
621.

*D. W. Sellers, James A. Logan* with him, for appellee.—Un-
der the act of 1879 courts of common pleas may authorize
amendments to charters of turnpike companies so as to extend
their route: Wilson's Ap., 140 Pa. 177; Bouvier, titles, Art-
icles, Conditions and Amendments.

In the present case the amendment which stands for the
charter expressly and definitely states and defines the route,
so that the objections that are found to the charter considered
in Groff's case cannot be made in the present case.

Although time does not run against the commonwealth and
therefore mere delay will ordinarily work no prejudice to its

rights, yet where, in addition to the delay, there are circumstances which usually estop individuals from asserting their rights, the commonwealth is equally estopped with individuals: Willmott v. Barber, L. R. 15 Ch. Div. 105; Attorney General v. Johnson, 2 Wilson Ch. Rep. 102; Attorney General v. Sheffield Gas Consumer's Co., 3 De G. M. & G. 304; Attorney General v. Del. & Bound Brook R. R., 27 N. J. Eq. 1.

The equitable defence of laches can be set up in this proceeding: Pollard v. Shaaffer, 1 Dallas, 211; Lehr v. Beaver, 8 W. & S. 106; Church v. Ruland, 64 Pa. 441; Le Fevre v. Le Fevre, 4 S. & R. 241; Com. v. Miltenberger, 7 Watts, 450.

OPINION BY MR. CHIEF JUSTICE PAXSON, February 13, 1893:

We need not discuss the effect of the amendment of the charter of the defendant company by the court of common pleas of Montgomery county, by which it was authorized to extend its road. That decree stands unreversed and unappealed from, and under it, and in entire good faith, the defendant has made the extension of its road of which the commonwealth through its attorney general now complains. Upon the faith of this decree the defendant has expended a large amount of money without any warning on the part of the commonwealth of any objection on her part. The defendant company was acting under color of authority, in pursuance of a decree of one of the commonwealth's own courts, and it seems ungracious on the part of the commonwealth after permitting the company to expend a large amount of money in extending their turnpike road to question years afterwards the regularity of the proceedings under which the expenditure was made. Were the complainant here a private individual we would not hesitate to say that his laches was a bar to this proceeding. Is the commonwealth in any better position? We think not. It is true, the statute of limitations does not run against the commonwealth. But this is not a question of the statute of limitations. It is a question of laches, and laches may be imputed to the commonwealth as well as to an individual. While the authorities upon this subject are not abundant, there are sufficient to justify the position now assumed. Equity is as much a part of the law of Pennsylvania as it was in 1787 when Chief Justice MCKEAN so declared

it to be in Pollard v. Schaaffer, 1 Dallas, 210 ; see Church v. Ruland, 64 Pa. 432.

In England, from whence we derived the great body of common law, and most of our principles in equity, it is well settled that while time will not run against the crown, yet time, together with other elements, may make up a species of fraud and estop even sovereignty from exercising its legal rights.

In the case of the Attorney General v. Johnson, 2 Wilson Ch. 102, there was an attempt on behalf of the crown to restrain a purpresture in the river Thames. The court refused to entertain the bill because of the delay on the part of the attorney general in instituting the proceeding. In the case of the Attorney General v. Sheffield Gas Consumer's Co., 3 De G., M. & G. 304, the real parties complainant after having failed in a direct attempt, as here, procured the attorney general to file an information and bill on behalf of the public to restrain the gas company from digging up the highway for the laying of pipes. That case was originated precisely as we understand this to have been. There is nothing to show that this proceeding was directed by command of the commonwealth. On the contrary, it is at least alleged to be the act of private parties who have induced the attorney general to allow his name to be used as representing the commonwealth. In the case referred to the injunction was refused on the ground that the defendant company's plans and acts were notorious, and that the delay of the attorney general, while the defendants were expending money in the construction of their works, disentitled even the public to relief.

The same rule has been held in the neighboring state of New Jersey. In the case of the Attorney General v. The Delaware and Bound Brook Railway Company, 27 New Jersey Equity, 1, the defendant company was constructing a bridge across the Delaware river without having, as it was alleged, legislative authority therefor. An information was filed by the attorney general alleging that the defendants were guilty of a purpresture, that the bridge was a public nuisance, and asking for a decree of abatement. In that case it was held that where a party acting bona fide, and upon its not unreasonable construction of a public grant, has been permitted to expend a large sum of money in the construction of a public work, in the confidence

that it possessed all requisite legislative authority, without a word of protest or remonstrance till the work is practically completed, equity will refuse its aid, even to the state, leaving it to its remedy at law.  It was said by the chancellor in that case: "The work has been, from its commencement, a matter of public notoriety, and yet no action has been taken on the part of the state authorities, nor even any warning offered by them against the work.  The defendants have been permitted to make their immense expenditure upon their enterprise in the confidence of their convictions that they possessed all requisite legislative authority without even a word of protest or remonstrance.  Under such circumstances, equity will refuse its aid, even to the state, leaving it to its remedy at law."

In the case in hand, were we to consider that the order of the court amending the company's charter was ineffectual as concerns the extension of its road, it yet clearly appears that said extension was made under a mistake and belief as to the company's legal right, honestly entertained and based upon an order of one of the commonwealth's courts, which order stands unreversed and unappealed from; that the company has made a large expenditure of money on the faith of this mistaken belief; that the commonwealth knew, or ought to have known, and is chargeable with knowledge of this expenditure, and with knowledge of the company's mistaken belief, and encouraged that expenditure by neglecting or abstaining from asserting the commonwealth's rights.

It may be said, however, that this suit is a proceeding at law and that, therefore, the cases cited do not apply.  But the remedy at law intended to be left open by the decisions in equity is not such a proceeding as would be practically the equivalent of a bill in equity.  This quo warranto aims at the destruction of defendant's property.  A bill in equity could do no more.  The remedy at law referred to is not one which would accomplish the same results as a mandatory injunction, such as a writ of quo warranto, or an indictment for maintaining a nuisance.  It means merely an action at law to recover damages for any injury sustained.

Under these circumstances, we are of opinion that the commonwealth is not entitled to judgment in this proceeding.

Judgment affirmed.